UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


TERRY ALLEN PARKS                                CIVIL ACTION

v.                                               NO. 16-15466

TERREBONNE PARISH                                SECTION "F"
CONSOLIDATED GOVERNMENT, ET AL.


ORDER AND REASONS

Before the Court is Terrebonne Parish Consolidated Government's motion for summary judgment. For the reasons that follow, the motion for summary judgment is GRANTED.

**Background**

This civil rights litigation arises from a former Terrebonne Parish employee who alleges that he was forced into early retirement after failing a drug test.

Terry Allen Parks has a bachelor's degree in computer science. He began working for Terrebonne Parish Consolidated Government (TPCG, or the Parish) on April 5, 1982 and, after a probationary period, he became a permanent employee of the Parish. He ultimately worked in a safety-sensitive position in Pollution Control, where his duties included working on computers that operated the sewer

system, providing technical support to all phases of the waste water division, maintaining the sewer record drawings file system, periodically reviewing sewer construction plans for private development and public projects, and providing all primary phases of activity necessary for maintaining the division's SCADA (supervisory control and data acquisition) and GIS systems. In addition to operating the SCADA system, Mr. Parks also conducted field and survey work.

As a tenured and permanent public employee, Parks could only be terminated for cause. During his 33 years of employment, Parks had only one reprimand. Parks planned to retire at the age of 62, in 2021, despite having the necessary retirement credits to have done so since April 2014. Parish employees who retire are entitled to post retirement group health benefits provided by the Parish. On the other hand, Parish employees who are terminated for cause are not entitled to post retirement group health benefits.

Throughout Parks's employment, the Parish had in effect a drug testing policy under section 13 of the TPCG personnel manual, which called for random drug testing of safety-sensitive employees,[1] as well as a grievance procedure, under section 8 of

---

[1] Section 13, E-2.1 states,
   All DOT regulated employees and NON-DOT employees who occupy safety-sensitive...positions, shall be subject to random selection for submission of a urine specimen...for routine analysis and screening for the

the TPCG personnel manual.[2]  The drug testing policy provides that

"all [Parish] drug screens shall be submitted in accordance with

the guidelines set out by the United States Department of

Transportation at 49 CFR Part 40."  Pursuant to Parish policy,

"[t]he confirmed presence of a controlled...substance in a urine

sample...shall result in termination of said individual."  The

Parish's drug policy mandates that "[a] urine sample of a[n]

employee which has been confirmed as having the presence of a

controlled dangerous substances must be retained by the laboratory

in properly secured, long-term, frozen storage for at least one

year."  Any employee who has been informed that his urine sample

tested positive for a controlled substance "shall have the right

to arrange for a retesting of a portion of his/her original urine

specimen if the employee makes a written request for retesting

---

        presence of controlled dangerous substances and alcohol,
        in accordance with all applicable state and federal laws
        and regulations.
[2] The grievance procedure at section 8.2 provides, among other
things, that:
        D.  The only grievance which may be brought as an appeal
        and be the subject of a hearing before the Personnel
        Board is a disciplinary action taken against a full-time
        permanent employee, such as suspension, dismissal,
        reduction in pay or demotion, and then to test the
        reasonableness of such action.  No other grievances or
        complaints may be brought as an appeal before the
        Personnel Board.
        E.  An employee who wishes to request a hearing before
        the Personnel Board must submit a written statement to
        the Personnel Director within eight (8) working days
        after receipt of the decision of the Chief
        Administrative Officer.

within sixty days of receipt of the final test result from the MRO [medical review officer]." The drug testing policy states that "[a]ll Terrebonne Parish drug screens shall be submitted in accordance with the guidelines set out by the United States Department of Transportation at 49 CFR Part 40." Finally, the drug testing policy states that "[e]mployees who have been disqualified from employment due to positive drug...test results...shall be ineligible for employment with TPCG for a period of one year."

As a safety-sensitive employee, Mr. Parks was required to submit to random drug tests as a condition of employment. Since 2003, Mr. Parks submitted to seven random drug screens. On October 12, 2015, Parks, as he had done in the past, was required to submit to a random drug test as a condition of his employment as an Instrumentation Technician. Parks's immediate supervisor, Michael Ordogne, informed Parks that he had been randomly selected to take a drug test. The drug testing process consists of three parts: the drug test was administered and the sample collected by Multi-Management Services, Inc. (MMSI); the sample was tested by Alere Toxicology Services, Inc.; and it was reviewed by Brian N. Heinen, a Professional Medical Corporation.

Sometime before 8:30 a.m. that day, Parks drove to MMSI. MMSI's Kevin LeCompte, who as part of his training was familiar

with the Parish's drug screening procedures, handled the urine collection. LeCompte used the Non-Federal Four-Part Drug Testing and Control Form. One copy of the form goes with the collector, MMSI, one goes to the medical review officer, one goes to the employee submitting the specimen, and the fourth goes to the lab, Alere. One of those sheets contains the labels which are put on the vials containing the urine to seal them for chain of custody purposes. Parks's specimen ID number provided by the drug testing and control form was 202232929. With LeCompte standing outside the restroom, Parks urinated in the cup, and returned the cup to LeCompte, who never lost visual contact with the specimen. LeCompte, in Parks's presence, then poured the urine into two vials. Then, Parks accompanied LeCompte to his office, where they finished the paperwork.

LeCompte documented the time and temperature of the specimen. LeCompte completed the Drug Testing and Control Form in Parks's presence. Parks signed the form. In so signing, Parks certified that the specimen he provided was his, and that it was not adulterated in any manner, that the specimen was sealed with a tamper-evidence seal in his presence, and that the information provided on the form and the label affixed to each specimen was correct. As is standard procedure, LeCompte sealed the vials with a tamper proof seal while Parks sat in front of him. LeCompte then put the sealed vial next to a pen in front of Parks for him

to initial. While LeCompte completed his paperwork, he saw that Parks had a pen in his hand and LeCompte saw Parks moving the pen; LeCompte thought that Parks was initialing the vials. But Parks did not initial the vials. Parks did not complain to anyone at MMSI that there was any issue with his specimen or with the sealing of the vials.

For chain of custody purposes, the number of the label placed on the specimen vial (here, 202232929) coincides with the number on the drug testing and control form. LeCompte then puts the vials in a plastic bag which is to be sent to the lab and completes the paperwork. The lab's, Alere's, chain of custody matches that of MMSI's.

As a forensic toxicology laboratory, Alere tests urine samples for federally mandated drug tests as well as those required by private employers. Alere verified the chain of custody concerning Parks's urine by comparing the seal number on the vial to that of the Drug Testing and Control Form. After chain of custody was verified, Alere checked the sample for any fatal flaws. A fatal flaw would prevent it from performing the testing. For example, a fatal flaw would be the specimen ID numbers not matching, or the seal on the vial not being intact, or if there was an insufficient amount of urine. Alere also follows a chain of custody once the vials enter the laboratory. Alere verified

chain of custody.  Parks's urine sample that Alere received was sealed with the lab number certified by Parks.  Alere followed its protocol for testing.  Once verifying chain of custody and ruling out fatal flaws, Alere personnel broke the seal on the vial, poured into a bar coded tube the aliquot (a small portion of the sample), and sent the tube to the screening department.  The sample certified by Parks contained 31 nanograms per milliliter of THC.  There were no flaws that prevented testing of the sample, and personnel from Alere testified that "[t]here were no errors in this testing."[3]  That Parks neglected to initial the specimen label -- the specimen sample sealed with a specimen identification number that he certified was his -- is not considered a flaw, nor is it the sort of flaw that is required to be corrected.

Because the sample tested positive for marijuana, the results were sent to the medical review officer (MRO), Dr. Heinen, on October 14, 2015.  The MRO received the results and chain of custody from Alere, which showed the positive indication for marijuana.  Brittany Comeaux, who assists Dr. Heinen on non-DOT tests, attempted to call Parks to collect information such as what

---

[3] Alere's David Green, Ph.D., testified:

> There were no problems with the chain of custody, and I'm 100 percent confident that the sample we received sealed with this lab number and certified by Mr. Parks contained marijuana, delta 9 THC carboxylic acid, at a concentration of 31 nanograms per milliliter.

type of medications he was taking at the time of testing, to determine whether it contained THC. Comeaux attempted to contact Parks several times before they spoke on the morning of October 15, 2015 at 9:16 a.m. Comeaux informed Parks that his sample had tested positive for marijuana and then, consistent with protocol, asked him about any medications he takes and whether he has had any recent medical procedures. Parks told Comeaux what medications he takes and confirmed that he had not recently undergone any medical procedures. Comeaux then asked if he currently or has recently used marijuana, to which Parks responded no. Comeaux asked whether he had ever used it in the past. Parks responded that he had used it in the past, but that "it's been a while." Comeaux then asked whether he had been given a prescription for marijuana use; he had not. Comeaux then informed Parks that he could have the same sample re-tested at a different lab, but he declined. Parks also declined to speak with Dr. Heinen. Comeaux submitted the paperwork to Dr. Heinen, who checked the chain of custody and confirmed that the form matched the lab report.[4]

When an employee submits a urine specimen that tests positive for a controlled substance, Parish policy calls for termination subject to retest of the same urine sample and the right to appeal

---

[4] Dr. Heinen testified that Parks's test was non-DOT, which allowed people whom he had trained to do the review to collect the data from Parks.

to the personnel board.  On October 15, 2015, when Parks was advised that his urine sample had indicated positive for marijuana metabolites, he explored his options.  Throughout the day, he spoke with an attorney, his wife, as well as the Parish human resources director, J. Dana Ortego, his supervisor, Michael Ordogne, and Parish Manager Al Levron.

The first person Parks called after he was informed of the positive drug screen was TPCG's human resources director, J. Dana Ortego.  Parks informed Ortego that he had just been advised that his drug test indicated positive for marijuana.  Ortego explained that Parks could have the same sample retested at his expense.[5] Mindful of parish policy and knowing that employees who had failed drug tests in the past had been "terminated quickly, almost immediately," Parks asked Ortego how the positive drug test would impact his employment. Parks specifically "asked him if [the positive drug test] would affect my retirement."  Parks testified that he was "asking if [it was possible for him to] retire[, which would allow him to] maintain [his] group health insurance."  Ortego said he would have to talk to administration.

---

[5] Ortego says he "gave Mr. Parks the opportunity to ask me whatever questions he wanted."  Parks says Ortego "was the most hush-mouthed of everybody.  He really didn't tell me much except they had to talk to administration about it."

At some point during the day after he was notified of the positive drug test, Parks called an attorney that had previously represented him in another matter to see if she could take his case. More than once that day, Parks called his wife, Althea Parks, who was also employed by TPCG. Mrs. Parks testified that she told her husband if he had the option, he should probably retire.

Parks called and spoke with Dr. Hans Heinen (another doctor at Dr. Brian Heinen's office) because he wanted to find out the drug collection procedures. Parks then spoke with Michael Ordogne in Ordogne's office; Parks informed him that he failed the drug test. Parks spoke with Ordogne in his office at least one other time later that day. Ordogne told Parks that he would have to call parish administrators to discuss with them whether retirement was an option, but that otherwise he would have to be terminated.[6] When Parks left Ordogne's office, he called Parish Manager Al

---

[6] Mike Ordogne testified that Parks was in his office and admitted that he had smoked marijuana, and was worried that people would think he was a pothead. Ordogne assured him that the positive drug test was confidential. Ordogne testified that Parks indicated that he felt the drug test was not handled correctly, but he did not recall Parks identifying anything specific about the alleged mishandling. Parks testified that he told Ordogne (and possibly Levron) at some point that he did not remember putting his initials on the vial seals.

Levron.   Levron testified that they discussed appeal rights,
retesting the urine sample, and issues concerning termination or
retirement.   Parks told Levron he failed a drug test and said,
"Looks like I'm going to be fired."  Levron testified that he told
Parks that "there are appeal procedures that are available to you
in the parish code" and offered to send them to him.   Parks said
he already had the manual, but Levron said he would send it anyway.
Parks says Levron asked Parks how old he was.   Parks explained he
was 55, but that he was eligible for retirement because he was
already in the DROP program.   Levron and Parks discussed the
possibility of retirement, but Levron could not offer Parks that
option without speaking to the parish president.   Parks says Levron
told him he should retire.   Levron also emailed Parks the Parish's
drug testing policy even though it was available on the intranet.
When Parks spoke to Levron a second time later that day, Parks
testified that Levron told him that he "needed to retire or that
I would in all likelihood be terminated tomorrow."

        At some point during the day, Ortego participated in a
meeting with parish manager Al Levron, parish president Michel
Claudet, and parish attorney Courtney Alcock to discuss Parks's
status.[7]  During the meeting, Ortego alluded to the procedures in

---

[7] Ortego described the typical procedure as follows: if he is
advised that an employee tested positive for an illegal drug, he
reports that finding to his direct supervisor, Al Levron, who then
reports the result to the parish president.

the manual and said that termination subject to appeal was the likely course of action. According to Ortego, they discussed how Parks had been a longstanding employee of the Parish and as a result Parish officials considered allowing him to retire instead of firing him. Everyone agreed that Parks should be given the option of retirement, which would allow him to maintain the insurance benefits. The parish president had no objection to administration allowing Parks to request retirement instead of processing his termination.

Sometime after the meeting, Levron called Ortego and told him that when Parks gets off work, he will be going to Ortego's office; Levron advised Ortego to accept Parks's retirement letter. Parks called Levron again and asked him whether or not he would be allowed to retire. Levron conveyed the administration's decision to Parks, who was advised that he would be permitted to take early retirement. When Parks arrived at Ortego's office to finalize his retirement, he asked if there was a retirement form he could complete. Ortego told him no, and gave him a pad of paper, in which Parks wrote:

> Please accept this as my request for retirement effective today (10/15/15) 4:00pm. I would also like to take advantage of any retirement benefits I am entitled to.

Parks signed and dated the request, and it was stamped Received by TPCG Human Resources that same day, October 15, 2015. Parks never

had the urine sample retested, never had another drug screen, and never applied for reemployment following the one year period of separation.[8]

On October 12, 2016, Parks sued Terrebonne Parish Consolidated Government, Multi-Management Services, Inc., Alere Toxicology Services, and Brian N. Heinen, a professional medical corporation, alleging that the positive test result was due to procedural errors made by MMSI, Alere, and Heinen in administering the test, and that the positive drug test, which was done and taken in violation of the Fourth Amendment, cannot support the termination of a tenured public employee like him. After three of the defendants filed motions to dismiss, the plaintiff amended his complaint.[9] Parks alleges in his amended complaint that the drug test was unreasonable under the Fourth Amendment because it was not conducted in accordance with minimum procedural requirements and standards, and that MMSI, Alere, and Heinen were acting under color of state law and in accordance with official municipal policy. He alleges that TPCG, acting in accordance with its municipal policy, relied solely on the procedurally defective and

_____

[8] Parks testified that he was familiar with the grievance process available to Parish employees. However, he indicated in his deposition that he was unsure whether or not he could pursue a grievance process once he was no longer employed by the Parish. Parks also testified that he never applied for reemployment consistent with G-6 of the Parish's drug testing policy.
[9] The Court denied as moot the motions to dismiss the initial complaint.

unconstitutional drug test in presenting Parks with the ultimatum to either take early retirement, or be terminated.  As a result of the defendants' conduct, culminating in his constructive discharge, Parks alleges he suffered financial losses including past lost wages, lost future earnings, lost life insurance premium benefits, lost long-term and short-term disability benefits, and lost deferred retirement benefits; he also claims that he has suffered mental anguish, emotional distress, and loss of enjoyment of life.  Parks seeks reinstatement as well as damages.

On February 22, 2017, the Court granted MMSI's motion to dismiss the plaintiff's claims against it.  On that same day, the Court granted in part and denied in part the Parish's motion to dismiss or for summary judgment: the motion was granted insofar as the Parish requested dismissal of the plaintiff's Section 1983 claim based on the Fourth Amendment; the motion was denied in part insofar as the Parish sought dismissal of the plaintiff's Section 1983 claim based on the Fourteenth Amendment, insofar as it sought dismissal of the plaintiff's state law claims (due to inadequate briefing), and insofar as it alternatively sought summary judgment or a more definite statement.  In March 2017, Alere's motion for judgment on the pleadings was granted, and the plaintiff's claims against Heinen were dismissed without prejudice due to the plaintiff's failure to obtain a responsive pleading or entry of

default.  The Parish now seeks summary relief dismissing the plaintiff's remaining claims.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc.,

15

819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II.

*A.*

Section 1983, which was enacted pursuant to Congress's authority to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of state law. Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). It creates a private right of action for violations of federally-secured rights under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...shall be liable to the party injured.

42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must satisfy three elements:

> (1) deprivation of a right secured by the U.S. Constitution or federal law;
>
> (2) that occurred under color of state law, and
>
> (3) was caused by a state actor.

Victoria W. V. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004)(citation omitted).

*B.*

Parks' remaining Section 1983 claim against the Parish must be analyzed in accordance with the Monell framework. Municipalities are "persons" within the meaning of § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). But, it has been cautioned, "[t]hey are liable only for their own acts and not those attributed to them by principles of *respondeat superior*." Larpenter, 369 F.3d at 482 (citing Monell, 436 U.S. at 691-92). Imposition of Section 1983 liability against a municipality under Monell is appropriate in the limited circumstance of when a constitutional tort is caused through the execution of a policy or custom of the municipality. See Bowen v. Watkins, 669 F.2d 979, 989 (5th Cir. 1982)(citation omitted). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694.

To determine whether municipal liability attaches, the Court looks to whether unconstitutional conduct is directly attributable to the municipality through some official custom or policy; "isolated unconstitutional actions by municipal employees will almost never trigger liability." See Piotrowski v. City of

<u>Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001)(citations omitted). Indeed, the rules for imposing municipal liability are well-settled; proof of three elements is vital: (1) a policy maker; (2) an official policy or custom; and (3) causation: a violation of constitutional rights whose "moving force" is the policy or custom. <u>Id.</u> (citing <u>Monell</u>, 436 U.S. at 694).[10] Official municipal policy, the U.S. Supreme Court has observed, "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." See <u>Connick v. Thompson</u>, 131 S.Ct. 1350, 1359 (2011)(citations omitted)("These are 'action[s] for which the municipality is actually responsible.'"). The Fifth Circuit has defined an official policy for Section 1983 purposes as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the

---

[10] Proof of these three elements is necessary "to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 471 (5th Cir. 1999) (citation omitted).

governing body of the municipality or to an official to
whom that body had delegated policy-making authority.

Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984)(*en
banc*).

"Municipal liability for civil rights violations under § 1983
is based on causation, rather than *respondeat superior*." Bolton
v. City of Dallas, 541 F.3d 545, 548 (5th Cir. 2008)(citation
omitted). "The fact that a tortfeasor is an employee or agent of
a municipality is therefore not sufficient for city liability to
attach; the municipality must cause the constitutional tort, which
occurs 'when execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy, inflicts the injury.'" Id.
(citation omitted). "That a plaintiff has suffered a deprivation
of federal rights at the hands of a municipal employee will not
alone permit an inference of municipal culpability and causation;
the plaintiff will simply have shown that the employee acted
culpably." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. V. Brown,
520 U.S. 397, 411 (1997)("Where a court fails to adhere to rigorous
requirements of culpability and causation, municipal liability
collapses [impermissibly] into respondeat superior liability.").
A determination of municipal liability demands more, imposing "a
stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."  <u>Id.</u>
("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.").  "Liability for unauthorized acts is personal; to hold the municipality liable, <u>Monell</u> tells us, the agent's action must implement rather than frustrate the government's policy." <u>Bolten</u>, 541 F.3d at 551 (quoting <u>Auriemma v. Rice</u>, 957 F.2d 397, 400 (7th Cir. 1992)).

III.

<em>A.</em>

The Fourteenth Amendment forbids a state from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, § 1.  "[C]ertain public employment situations may endow an employee with a legally cognizable property interest."  <u>Muncy v. City of Dallas, Tex.</u>, 335 F.3d 394, 398 (5th Cir. 2003)(citation omitted).  Whether a property interest exists "is guided by the specific nature and terms of the particular employment at issue, and informed by the substantive parameters of the relevant state law."  <u>Id.</u>

To succeed on a Section 1983 claim based on termination of employment without being afforded procedural due process, Parks must demonstrate that (1) he has a property interest in his

employment sufficient to entitle him to due process protection;
and (2) that he was terminated without receiving the due process
protections to which he was entitled.  See McDonald v. City of
Corinth, Tex., 102 F.3d 152, 155-56 (5th Cir. 1996).  "In
Louisiana, a permanent classified civil service employee has a
protected property interest in [his] job."  See Wallace v. Shreve
Mem'l Library, 97 F.3d 746, 748 (5th Cir. 1996).  "'[S]ome type of
hearing' is ordinarily a constitutional requirement for due
process purposes before a public employee who has a property
interest in his job may be terminated."  Fowler v. Carrollton Pub.
Library, 799 F.2d 976, 980 (5th Cir. 1986)(citing Cleveland Bd. of
Educ. V. Loudermill, 470 U.S. 532, 542 (1985)).

*B.*

When an employee submits a urine specimen that tests positive
for a controlled substance, Parish policy calls for termination
subject to retest of the same urine sample and the right to appeal
to the personnel board.  Although Parks glosses over the
opportunities to retest and the post-deprivation right to appeal
to the personnel board, those are components of the Parish policy
that he challenges as violating his right to procedural due
process.  The Parish appears to concede that Parks had a protected
property interest in his employment such that, if Parks was

constructively discharged,[11] the Parish's failure to provide him with pre-deprivation process "unquestionably violated his constitutional rights." <u>Fowler</u>, 799 F.2d at 980.

"To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign." <u>Finch v. Fort Bend Indep. Sch. Dist.</u>, 333 F.3d 555, 562 (5th Cir. 2003)(citation omitted).[12] A constructive discharge may also occur when the employer places the employee "between the Scylla of voluntary resignation and the Charybdis of forced termination." <u>Fowler</u>, 799 F.2d at 981. Notably, "[c]onstructive discharge in a procedural due process case constitutes a § 1983 claim only if it amounts to forced discharge to avoid affording pretermination hearing procedures." <u>Id.</u>; <u>see</u> <u>also</u> <u>Rutland v. Pepper</u>, 404 F.3d 921, 923 (5th Cir. 2005).

---

[11] Of course, the Parish's threshold argument favoring dismissal is that Parks was not constructively discharged, but, rather, he elected to retire.

[12] Whether a reasonable employee would feel compelled to resign depends on the facts and circumstances of each particular case, but the Fifth Circuit has identified a number of relevant factors; the only one that is marginally relevant to this case is "offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not." <u>Barrow v. New Orleans S.S. Ass'n</u>, 10 F.3d 292, 297 (5th Cir. 1994). Neither party focuses on these factors because they are not relevant to the circumstances of this case.

Parks submits that the facts of his case fall squarely within
the reach of Findeisen v. North East Ind. Sch. Dist., 749 F.2d 234
(5th Cir. 1984) and Bueno v. City of Donna, 714 F.2d 484 (5th Cir.
1983) because, as the Fifth Circuit described in Fowler, the
plaintiffs in Findeisen and Bueno were faced with choosing between
"the Scylla of voluntary resignation and the Charybdis of forced
termination." But Parks glosses over critical language in those
cases, as amplified in the Fowler case, which removes his case
from the scope of those decisions:

> Findeisen and Bueno, far from constitutionalizing any
> cause of action for constructive discharge, apply only
> in the narrow range of cases in which an employee
> confronts an either/or termination proposition, and it
> can be said that the state agency's motive is to avoid
> providing the pretermination remedy required by
> Loudermill. Findeisen and Bueno reinforce our
> conclusion that **a valid procedural due process claim**
> **requires the employer's conduct to have been motivated**
> **by a desire to avoid subjecting its actions to the**
> **scrutiny of a termination-related hearing.**

Fowler, 799 F.2d at 981 (emphasis added).

Here, Parks fails to submit or point to any evidence in the
summary judgment record indicating or even compelling an inference
that the Parish was motivated by a desire to avoid pre-termination
proceedings when Parks was presented with the option to retire
instead of being fired.[13] In fact, the record indicates that the

---

[13] Although the record indicates that Parks himself was the one to
request retirement, or at least question parish officials

Parish was motivated by Parks's years of service when it opted to reject its own policy mandating termination of employment for employees who test positive for controlled substances in order to allow Parks to retire, in consideration for his many years of service, so that he could receive the benefits he would not otherwise receive if he was fired. Indeed, the record indicates that Parks discussed his options with Ortego, Ordogne, and Levron, and it is undisputed that parish administrative officials conferred and discussed how Parks had been a longstanding employee of the Parish; everyone agreed that Parks should be given the option of retirement, which would allow him to maintain all insurance benefits. Absent from the record is any evidence allowing an inference that the Parish was motivated by a desire to avoid pre-deprivation process in permitting Parks to elect retirement.

The Fifth Circuit has acknowledged that there is a "potential conflict" in its case literature concerning whether a plaintiff advancing a constructive discharge theory must prove that his employer was motivated by a desire to avoid pre-termination proceedings in addition to proving that the employee had to choose

---

regarding the impact of the positive drug screen on his retirement, the Court declines to search the entire record to determine whether there is any genuine dispute concerning whether it was Parks to first request retirement, or the Parish to suggest it in lieu of termination.

between resignation and termination; or whether it need only prove one or the other. A case decided *after* Fowler (Brown v. Texas A & M University, 804 F.2d 327, 333 (5th Cir. 1986)) held that a plaintiff advancing a constructive discharge theory must prove either that the employee was forced to choose between resignation and termination or that the employer's conduct was motivated by a desire to avoid subjecting its actions to the scrutiny of a termination-related hearing. See LeBeouf v. Manning, 575 Fed.Appx. 374, 377 n.1 (5th Cir. 2014)(declining to resolve the "potential conflict" because LeBeouf alleges facts sufficient to plausibly establish that she was forced to choose between resignation and termination and that the defendant was motivated by a desire to avoid pre-termination procedures). Because Fowler was decided before Brown, it would ostensibly control under the rule of orderliness doctrine (see LeBeouf, 373 Fed.Appx. at 377 n.1), dooming Parks's constructive discharge theory in this case for the reasons already articulated. Nevertheless, even if the Court assumes that Parks need only prove that he was forced to choose between termination and retirement such that genuine issues of material fact preclude summary judgment in favor of the Parish on the constructive discharge theory, the Court finds that Parks was given all the process he was due.

*C.*

Assuming that Parks's constructive discharge theory could survive summary judgment, the Parish was constitutionally obliged to ensure that the deprivation Parks suffered occurred with adequate procedural protections. The Parish submits that the summary judgment record discloses no genuine dispute that it complied with its constitutional obligations. The Court agrees.

With respect to pre-deprivation process, the Supreme Court has explained:

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

Loudermill, 470 U.S. at 546 (citations omitted). To be sure, "[p]rocedural due process is a flexible concept whose contours are shaped by the nature of the individual's and the state interests in a particular deprivation." Caine v. Hardy, 943 F.2d 1406, 1411-12 (5th Cir. 1991). The necessary amount and kind of pre-deprivation process thus depends on an analysis of three factors:

First, the private interest that will be affected by the
official action; second, the risk of an erroneous
deprivation of such interest to the procedures used, and
the probative value, if any of additional or substitute
procedural safeguards; and finally, the Government's
interest, including the function involved and the fiscal
and administrative burdens that the additional or
substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

In other words, the form of the process ("some type of

hearing") that is constitutionally required for due process

purposes before an employee who has a property interest in his

employment may be terminated depends on the circumstances.[14] See

Loudermill, 470 U.S. at 542. That "due process if flexible and

calls for such procedural protections as the particular situation

demands"[15] means that something less than a formal hearing often

comports with pre-deprivation due process; an employer may fashion

a less elaborate meeting so long as it achieves conferring the

_____

[14] The Court assumes, without deciding, that Loudermill applies
here, given that both sides have framed the procedural due process
debate in Loudermill terms. However, the Court is compelled to
observe that Fowler reasonably observed that "[t]he Loudermill
rule does not a fortiori apply to cases of alleged constructive
discharge." Fowler, 799 F.2d at 980 (explaining that "[a]
pretermination hearing is just not feasible when the gist of the
employee's claim is that he was forced to resign by unbearable
working conditions."). It would seem to follow that a pre-
constructive discharge hearing is neither feasible nor necessary
where an employee elects early retirement to avoid the consequences
of termination called for by a positive drug test about which the
only purported challenge to the reliability of the test result was
that the plaintiff neglected to initial the seals. (The parties
quarrel about whether the plaintiff's neglect was purposeful).
[15] Gilbert v. Homar, 520 U.S. 924, 930 (1997).

process that is due.  To fashion sufficient process, the parties

must realistically assess what that process ultimately achieves.

> [T]he constitutional minimums for due process require
> that the final decision maker must hear and consider the
> employee's story before deciding whether to discharge
> the employee.  The purpose of this is self-evident.  It
> is to provide a "meaningful opportunity to invoke the
> discretion of the decisionmaker ... before the
> termination takes effect."

Coggin v. Longview Independent School Dist., 337 F.3d 459, 465 (5

Cir. 2003)(citations omitted).  There, the Fifth Circuit, *en banc*,

noted:  "Both the employer and the employee benefit from this

opportunity, for it ensures that the decision maker reaches an

accurate decision."  Id. at 466 n. 32 (citations omitted).  "It

thus protects persons 'not from the deprivation, but from the

mistaken or unjustified deprivation of life, liberty, or

property.'"  Id. (citing Carey v. Piphus, 435 U.S. 247, 259

(1978)).[16]  Indeed, although "some kind of hearing" is the minimum

---

[16] The Supreme Court has cautioned:

> The federal court is not the appropriate forum in which
> to review the multitude of personnel decisions that are
> made daily by public agencies.  We must accept the harsh
> fact that numerous individual mistakes are inevitable in
> the day-to-day administration of our affairs.  The
> United States Constitution cannot feasibly be construed
> to require federal judicial review for every such error.
> In the absence of any claim that the public employer was
> motivated by a desire to curtail or to penalize the
> exercise of an employee's constitutionally protected
> rights, we must presume that official action was regular
> and, if erroneous, can best be corrected in other ways.

called for to satisfy due process, so long as an adequate post-deprivation remedy exists, "[pre-deprivation process] may consist of no more than a meeting at which the employer states the grounds for dismissal and gives the employee an opportunity for rebuttal." Caine v. Hardy, 943 F.2d 1406, 1412 (5th Cir. 1991)(citations omitted).  Such an opportunity was presented here.

On this record, Parks received adequate pre-deprivation due process.  He received notice and an informal hearing with his supervisor, the human resources director, and the Parish manager. In his informal discussions with these three people, Parks was given ample opportunity to give any explanation for the failed drug test.  More, he was extended the courtesy of discussing the options available to him, thus invoking the discretion of the decision makers, even where it would seem, by Parish policy, discretion was not indulged (termination for a failed drug test was stated in mandatory terms).  It is undisputed that Parks was notified that he failed a drug test,[17] and he met with parish officials and employers throughout the ensuing day to discuss his options, and to present any explanation he had for the test

---

The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

Bishop v. Wood, 426 U.S. 341, 349 (1976).

[17] It is likewise undisputed that Parks was familiar with Parish policy regarding a failed drug test qualifying as a terminable offense.

indicating positive for marijuana. Parks's supervisor (Ordogne), the parish human resources director (Ortego), and the parish manager (Levron) each heard from Parks and advised him of his appeal rights and the right to re-test his urine sample; they also discussed the possibility of retirement to avoid the unfavorable insurance consequences of termination. Perhaps as an explanation for the failed test, Parks indicated to one or two of these parish officials that he was concerned with the procedure employed during the drug test, but he did not elaborate (or, even if he did specify that he did not initial the seal, it is undisputed that failure to initial the seal is not a fatal flaw undermining the validity in a drug test).[18] Notably, although more than one parish official told him that he could have the urine sample retested, he declined.[19]

Mindful of the flexibility of procedural due process and that pre-termination process in particular is "an initial check against mistaken decisions-essentially, a determination of whether there are reasonable grounds to believe that the charges against the

---

[18] It is undisputed that Parks did not initial the seal on the vial; however, there is likewise no dispute in the record that this failure on Parks's part did not compromise the validity of the drug test. In fact, there is no evidence in the record indicating that there was some flaw in the drug test protocol that compromised the result. Nor does Parks challenge his own contemporaneous certification that the urine in the vial was his.

[19] The Court will not speculate what process, if any, would have unfolded or would have been due had he pursued a re-test the urine sample.

employee are true and support the proposed action," <u>Loudermill</u>, 470 U.S. at 545-46, the Court underscores that the process due Parks under the circumstances of a "for cause" termination ground backed by scientific test result need not be elaborate; indeed, the process, which is designed in part to prevent the employer from making a mistake,[20] may be informal. See <u>Griffin v. Bennett</u>, 204 Fed.Appx. 565, 566-67 (7th Cir. 2006)(unpublished)(holding that pre-termination procedures were constitutionally sufficient where employee who failed employment-mandated drug test attended a meeting in which employer advised him that it had been notified of the positive drug test result, employee was given an opportunity to explain the test result, but declined, and, at the end of the meeting, was terminated). Similarly, here, Parks does not dispute that he had notice of the charge that he failed the drug test and he was given the opportunity to speak with parish officials concerning this fire-able offense. He admits that he explored his options (discussing his predicament with parish officials as well as with his wife), told at least one parish employee or official that he questioned the drug test protocol, but otherwise declined to retest his urine specimen or otherwise mount a challenge to the

---

[20] <u>See</u> <u>Browning v. City of Odessa, Tex.</u>, 990 F.2d 842, 844 (5th Cir. 1993)("an informal hearing which allows the employee to give his version of the facts sufficiently hedges against an erroneous dismissal and likewise satisfies the requirements of due process").

test result.  Throughout his telephone conferences and meetings with Ordogne, Ortego, and Levron, Parks was advised of his options, including the grievance process.  There is no controversy regarding these record facts, which demonstrate that Parks was given all the pre-deprivation process he was due.  See Browning, 990 F.2d at 844-45 (pre-termination meeting that lasted no more than 30 minutes complied with the Due Process Clause considering that the plaintiff was given notice of the proposed dismissal, informed of the reason, and given an opportunity to respond, and additionally considering that post-termination procedural safeguards were available, even if not pursued).  Parks offered nothing to parish officials, and he offers nothing now, to challenge the veracity of the positive drug screen, which supported for-cause termination.  Considering the failed drug test and its consequences, and after speaking and meeting with parish personnel and officials, he ultimately chose the retirement path.[21]

It is difficult to conceive of what additional pre-termination process would be due Parks in the face of testing positive for marijuana as a result of a drug screen, especially considering his failure to launch any challenge or explanation that might undermine the credibility of a scientific test result.

---

[21] And he declined to avail himself not only of the parish grievance procedures but also of the opportunity spelled out in the parish manual allowing employees who test positive for controlled substances to apply for reemployment after a year has passed.

It seems clear on this record that the risk of an erroneous deprivation was small, and the value of additional procedural safeguards (especially where Parks did not pursue the ones available and offers no suggestions as to how render a more effective rebuttal to a positive drug screen) would be negligible. See Mathews, 424 U.S. at 335 (the amount and kind of pre-deprivation process depends on the balance of three factors, including "the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards."). Under the circumstances, informal meetings with supervisors, some in person, some by telephone, constitute adequate pre-deprivation process.[22]

Parks's Section 1983 claim based on the Fourteenth Amendment focuses on insufficiency of pre-deprivation process and, in particular, the allegedly inadequate time he had to choose between termination and retirement. Insofar as Parks now attempts to allege a deprivation of post-termination due process, the Court finds that any such belated challenge must also fail on this record.[23] Parks failed to initiate any grievance procedure (such

---

[22] The Court underscores that there is no evidence in the record that would suggest that the Parish purposefully sought to avoid providing Parks with the constitutional minimum due process.

[23] There is nothing in Parks's complaint or amended complaint that would indicate he intended to challenge the Parish's failure to confer post-deprivation due process.

as a hearing before the personnel board) or otherwise avail himself of the process available to an employee constructively terminated as a result of a failed drug test.[24]  See Browning, 990 F.2d at 845 and n.7 (citations omitted)("This Court has consistently held that one who fails to take advantage of procedural safeguards available to him cannot later claim that he was denied due process.").  Parks merely submits that any grievance would have been futile.[25]  But he fails to explain how or why the Parish could or should have scheduled a full-blown post-constructive discharge hearing under the circumstances where Parks retired, failed to challenge the positive drug screen or pursue a re-test or even a new drug screen, failed to request a hearing before the personnel board pursuant to the Parish's grievance procedure, and failed to seek re-employment.  On this record, Parks offers no case literature to support his theory that the Parish was obliged, sua sponte, to schedule a hearing to assess whether its decision to allow Parks to retire following a failed drug screen was unjustified or correct.

---

[24] When an employee submits a urine specimen that tests positive for a controlled substance, Parish policy calls for termination subject to retest of the same urine sample and the right to appeal to the personnel board.  The Parish also permits an employee who failed a drug test to apply for rehiring after a year has passed.

[25] Yet he now claims that he was deprived of post-deprivation process that he never indicated to the Parish that he wished to pursue.

IV.

Finally, TPCG seeks judgment as a matter of law dismissing the plaintiff's state law claims, which the plaintiff appears to concede are derivative of his Section 1983 claims. The plaintiff advances no argument that would persuade this Court that he may maintain his state law claims when his claims based on the same federal constitutional rights are subject to dismissal on the merits. For the foregoing reasons, as well as the reasons articulated in this Courts Order and Reasons dated February 22, 2017, the Court finds that the Parish is entitled to judgment as a matter of law dismissing the plaintiff's state constitutional claims which are derivative of the federal constitutional deprivations he alleged in connection with his Section 1983 claims (Fourth and Fourteenth Amendment claims): the plaintiff's claims under Article I, Section 5 and Article I, Section 2 of the Louisiana constitution must be dismissed. Finally, insofar as the plaintiff now attempts to allege a claim under Article X, Section 8 of the Louisiana constitution, any such claim must be dismissed as untimely presented.[26]

---

[26] Insofar as the plaintiff alleged in his complaint that the drug test failed to comply with the Louisiana Drug Testing Act, that claim regarding protocol was directed toward the previously dismissed defendants and not even the plaintiff suggests that he pursues any such claim against the Parish. Even if he had pursued any such claim against the Parish, he offers no evidence in support

*** 

Accordingly, for the foregoing reasons, IT IS ORDERED: that the Parish's motion for summary judgment is hereby GRANTED.  The Parish is entitled to judgment as a matter of law and the plaintiff's claims are hereby dismissed with prejudice.

New Orleans, Louisiana, January 10, 2018

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

of the claim in opposition to the Parish's motion for summary judgment.